# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PROPERTY OF THE PEOPLE, *et al.*,

     Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
JUSTICE,

     Defendant.

Civil Action No. 17-1193 (JEB)

## MEMORANDUM OPINION

Plaintiffs want to know more about President Donald Trump's relationship with the Federal Bureau of Investigation. More specifically, they wonder about Trump's interactions with the agency <u>before</u> he became President: "Was he friend or foe? A reliable or unreliable informant? The target of an investigation into serious misconduct? A cooperative or uncooperative witness?" ECF No. 14 (Pl. MSJ) at 14. Or, perhaps, "did he never cross paths with the FBI at all?" <u>Id.</u> In search of answers, Plaintiffs submitted a request under the Freedom of Information Act to Defendant Department of Justice. The Government, as it is wont to do with law-enforcement records, issued a so-called "<u>Glomar</u>" response, meaning that it would neither confirm nor deny whether it maintained any such documents about Trump.

Plaintiffs responded by filing suit in this Court, and both parties have now moved for partial summary judgment. While the Court affirms that the Government may generally refuse to answer Plaintiffs' request, questions remain about whether "there exists a [narrow] category of responsive documents for which a <u>Glomar</u> response would be unwarranted." <u>PETA v. NIH</u>, 745

F.3d 535, 545 (D.C. Cir. 2014).  The Court therefore concludes that even partial summary judgment for either party is inappropriate, at least for the time being.

## I.    Background

Plaintiffs are Jason Leopold, an investigative reporter for Buzzfeed News; Ryan Shapiro, a PhD candidate at MIT; and Property of the People, a non-profit "dedicated to governmental transparency," including "for the Administration of Donald J. Trump."  Compl., ¶¶ 1-3. Together, they share an interest in whether "Donald Trump's past interactions with the FBI . . . [are] prologue to the current tumultuous relationship between the President and the Bureau."  Pl. MSJ at 1.  To that end, they submitted a FOIA request on March 16, 2017, seeking access to eight categories of records, all ostensibly related to Trump.  See ECF No. 12-2 (First Declaration of David M. Hardy, Exh. A).  First, they requested records referencing several FBI files: Nos. 194-NK-88595, 166-LV-29911, 137-NY-19967, 137-22152, and 92-PH-99239.  Id.  They attached documents, released from previous FOIA requests, showing Trump's name associated with each case number.  Id.  As a catch-all, they also sought "[a]ny and all records mentioning or referring to the living person Donald John Trump" from June 14, 1946, to June 15, 2015 — the day before he announced his candidacy for president.  Id.

That last catch-all category is the only issue currently before the Court.  The FBI has treated this group of records as distinct from Plaintiffs' requests tied to specific case numbers, opening a separate case within its FOIPA Document Processing System with its own tracking number (No. 1369375-000).  See ECF No. 12-1 (First Hardy Decl.), ¶ 6.  On March 23, 2017, the FBI issued a letter refusing to confirm or deny the existence of any law-enforcement records within that category.  Id., Exh. B.  After an unsuccessful administrative appeal, id., Exhs. C & D, Plaintiffs timely brought suit in this Court on June 18, 2017.  The parties have now filed Cross-

Motions for Partial Summary Judgment as to whether the agency fulfilled its FOIA obligations for "records mentioning or referring to . . . Donald John Trump."  Gov't MSJ at 2.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party.  See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Defenders of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007).  In FOIA cases, the agency bears the ultimate burden of proof.  See DOJ v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989).  The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).

### III.    Analysis

Generally, FOIA requires an agency to conduct a search and make requested records available unless they fall within one of the statute's nine enumerated exemptions.  See 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9).  When an agency does withhold documents, it typically must explain what has been withheld and why.  See, e.g., Vaughn v. Rosen, 484 F.2d 820, 825-28 (D.C. Cir. 1973) (requiring "relatively detailed" and "specific" explanations of withholdings).  There is, however, an exception when "confirming or denying the existence of [certain] records would" itself reveal protected information.  Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 893 (D.C. Cir. 1995).  Such a reply is called a Glomar response, named after a Cold-War-era CIA project that the agency wished to keep confidential.  See Marino v. DEA, 685 F.3d 1076, 1078 n.1 (D.C. Cir. 2012); Phillippi v. Cent. Intelligence Agency, 546 F.2d 1009, 1011 (D.C. Cir. 1976).

In this case, the FBI has dusted off its Glomar playbook, refusing to "confirm or deny" whether it maintains records mentioning or referring to Trump.   For such a (non-)response to be appropriate, the Government must show that revealing the very existence of records would "cause harm cognizable under a[] FOIA exception."  Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007).  The exception principally at issue here is Exemption 7(C).  That exemption protects "records of information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  In Glomar cases, Exemption 7(C) allows agencies to conceal the existence of responsive documents if the presence of such records in the agency's system would "associate the individual named in the

request with criminal activity" or otherwise compromise the person's privacy.  Nation Magazine, 71 F.3d at 893.

Plaintiffs challenge the Government's Glomar response in "two distinct but related ways."  Agility Pub. Warehousing Co. K.S.C. v. NSA, 113 F. Supp. 3d 313, 326 (D.D.C. 2015). First, they argue that the agency has previously "officially acknowledged" that the requested records exist.  If so, that would waive any right to offer a Glomar response.  See Moore v. CIA, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (internal citation omitted).  Second, they contend that even if not waived, Defendant has failed to justify its Glomar response under Exemption 7(C).  The Court takes each argument in turn.

### A.     Waiver

Plaintiffs first posit that "[t]he FBI's broad Glomar response is untenable in light of its previous release of responsive records bearing Donald Trump's name."  Pl. MSJ at 4 (emphases omitted).  It is true that agencies cannot rely on Exemption 7(C) — or any other exemption — to withhold "information that has been 'officially acknowledged' or is in the 'public domain.'"  Davis v. DOJ, 968 F.2d 1276, 1279 (D.C. Cir. 1992).  Here, Plaintiffs cite a litany of documents that the FBI released pursuant to previous FOIA requests, each of which either "mention[s] or refer[s]" to Donald Trump.  Those materials include:

- Cover sheets from litigation related to Trump's Mirage Hotel, see First Hardy Decl., Exh. A (Addenda A & B);
- A 1981 FBI report mentioning Trump and his Atlantic City casinos, id. (Addendum C);
- A complaint apparently filed against a Trump employee, id. (Addendum E);
- Several news articles briefly referencing Trump, id. (Addendum F); Pl. MSJ, Exh. 1; Second Hardy Decl., Exh A;
- An FBI report summarizing results from a Lexis Nexis search, apparently relating to the investigation of a Trump Organization affiliate, see First Hardy Decl., Exh. C (Addendum G);

- An investigation made into a person "fired by DONALD TRUMP," ECF No. 21-1 (Second Declaration of David M. Hardy, Exh A); and

- A complaint about harassing calls made <u>to</u> the Trump Organization.  <u>See</u> First Hardy Decl., Exh. C.

Given those releases, Plaintiffs are correct that the Bureau cannot flatly refuse to confirm or deny having <u>any</u> records related to Trump.  <u>See</u> <u>ACLU v. CIA</u>, 710 F.3d 422, 427 (D.C. Cir. 2013) ("[P]laintiff can overcome a <u>Glomar</u> response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a <u>Glomar</u> response is designed to protect.").  As the Bureau concedes, it must recognize any "records containing Trump's name that were previously acknowledged to exist by the FBI."  Gov't Reply at 6.

It may, however, still refuse to confirm or deny "the existence of <u>additional</u> records about Mr. Trump" "[o]utside of these limited releases," as it has done here.  <u>See</u> Second Hardy Decl., ¶ 12 (emphasis added); <u>see also</u> Gov't Reply at 14.  The D.C. Circuit has made clear that while an agency may "waiv[e] its <u>Glomar</u> response as to . . . officially acknowledged dispatches," it does "not waiv[e] its <u>Glomar</u> response as to all records about" the same person.  <u>Moore</u>, 666 F.3d at 1334.  In <u>Wolf</u>, for example, the plaintiff requested all records related to Jorge Eliecer Gaitan, a former Colombian politician.  <u>See</u> 473 F.3d at 372.  Because the CIA Director had previously confirmed having <u>some</u> records about Gaitan, the Court held that the agency had waived its blanket <u>Glomar</u> response.  <u>Id.</u> at 379.  It stressed, however, that the agency need only disclose "the existence of CIA records about Gaitan that have been previously disclosed (<u>but not any others</u>)."  <u>Id.</u> (emphasis added).

Plaintiffs, however, want more.  They argue that in light of these releases, they "are now entitled to that <u>information</u> which has been previously disclosed, not just those <u>records</u> which

have been previously disclosed."  Pl. Reply at 2.  That is, they believe that the "FBI must now

confirm the existence and justify the withholding of all documents which contain the same

information as the documents previously released."  Pl. MSJ at 7-8.  This is a bridge too far.

When a court evaluates "the official acknowledgement doctrine in the Glomar context," it must

"appl[y] it strictly."  Moore, 666 F.3d at 1333.  In that vein, "the 'official acknowledgement'

only extends to the specific records that are acknowledged by the agency."  Nat'l Sec.

Counselors v. CIA, 898 F. Supp. 2d 233, 288-89 (D.D.C. 2012) (emphasis added) (holding that

agency's official acknowledgement of some records had not pierced the veil as to others because

"[t]he fact that they are separate documents make all the difference"); see also James Madison

Project v. DOJ, 2018 WL 294530, at *11 (D.D.C. Jan. 4, 2018) ("[T]he D.C. Circuit's decision

in Wolf teaches that the record demanded must 'match' exactly the record that is publicly

acknowledged.").

Plaintiffs rejoin that the "focus of the FOIA is information, not documents."  Pl. Reply at

2 (quoting Mead Data Cent., Inc. v. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)).

True enough.  In this case, however, the only publicly available information is that the FBI has

certain, previously released records about Trump.  The "specific information at issue," Wolf, 473

F.3d at 239 (emphasis omitted), is whether the FBI might have "additional records about Mr.

Trump."  Second Hardy Decl., ¶ 12.  The public hasn't a clue on that question, and the Bureau is

entitled to keep the answer a secret.  The Court accordingly holds that the FBI has waived its

Glomar response only with respect to those exact records previously released.

B.     Exemption 7(C)

Next, Plaintiffs argue that even if not otherwise waived, Defendant has not justified

issuing its Glomar response pursuant to Exemption 7(C).  "[J]udicial review of an asserted

Exemption 7 privilege requires a two-part inquiry." FBI v. Abramson, 456 U.S. 615, 622 (1982).

As a threshold matter, the Court must determine whether the withheld "records or information"

were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). If the agency so

establishes, it must then demonstrate that a particular subpart of Exemption 7 applies. Here, it

must show that release of those records "could reasonably be expected to constitute an

unwarranted invasion of personal privacy." Id. § 552(b)(7)(C).

Once again, Plaintiffs attack the Government at each step. First, they contend that their

request encompasses non-investigative records, which necessarily fall outside Exemption 7's

purview. Second, they argue that even as to investigative records, the agency has not shown that

Trump's privacy interests outweigh the public's interest in any such documents. Finally, they

say that the FBI's Glomar response is invalid at least as to certain categories of investigative

records. The Court looks at each, ultimately finding that there are two small subsets of records

for which the FBI has not justified its Glomar response.

### 1. Non-Investigative Records

To refresh, Plaintiffs requested, *inter alia*, "[a]ny and all records mentioning or referring

to the living person Donald John Trump" from June 14, 1946, to June 15, 2015. See Hardy

Decl., Exh. A. On its face, this request encompasses both law-enforcement material and records

collected for other purposes, such as administrative and personnel files. This latter category of

records, of course, would not have been "compiled for law enforcement purposes" and thus

could not trigger Exemption 7(C)'s protection. See Jefferson v. DOJ, 284 F.3d 172, 179-80

(D.C. Cir. 2002) (remanding to agency because "FOIA request seek[ing] all records that [the

Office of Professional Responsibility] may have regarding AUSA Downing" was not limited to

law-enforcement records).

The Government does not dispute the point, instead arguing that it was not required to search for non-investigative files at all. See Gov't Reply at 17-18. First, it claims that Plaintiffs "provided no evidence to the FBI that there might be non-law enforcement FBI records on Trump." Id. at 17. That may be so, but for FOIA purposes, it is irrelevant. To craft a proper FOIA request, a person simply must meet two requirements: 1) "reasonably describe such records" and 2) follow "published rules stating the time, place, fees (if any), and procedures to be followed." 5 U.S.C. § 552(a)(3)(A). Contrary to Defendant's (uncited) assertions, there is no requirement that Plaintiffs provide evidence that such records exist.

Second, the Government offers a declaration from David Hardy, the Section Chief of the FBI's Record/Information Dissemination Section, which takes a different tack. There, Hardy maintains that "the FBI reasonably interpreted Plaintiffs' request" to encompass only "records about a third party related to the performance of the FBI's [law-enforcement] mission." Second Hardy Decl., ¶ 18. Ordinarily, however, the agency is "bound to read [the request] as drafted, not as . . . agency officials . . . might wish it was drafted." Miller v. Casey, 730 F.2d 773, 777 (D.C. Cir. 1984). Rather than construe a request narrowly, "an agency . . . has a duty to construe a FOIA request liberally." Nation Magazine, 71 F.3d at 890. Here, a liberal construction of "[a]ny and all records" related to Donald Trump would include both investigative and non-investigative files.

Hardy retorts that "[h]ad the FBI interpreted Plaintiffs' request as seeking each and every document in the FBI's possession bearing the name of Donald Trump," such a request would have been "overly broad/unduly burdensome." Second Hardy Decl., ¶ 16. The Bureau therefore "interpreted Plaintiffs' request in such a way as to make it possible for the FBI to substantively

respond." Id., ¶ 18. Even assuming that the FBI is entitled to apply such a savings construction, however, it has not proven that one was needed here.

Hardy asserts, in conclusory fashion, that the agency could only locate administrative or personnel files by asking "every FBI office and the more than 35,000 employees of the FBI to conduct searches for any non-investigative records bearing the name of Donald John Trump." Id., ¶ 16 (emphasis omitted). But it is not clear why this is so. Ordinarily, the FBI conducts searches by querying its Central Record System (CRS), "a comprehensive system of records consisting of applicant investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI." First Hardy Decl., ¶ 21. Hardy says that "the vast majority of the FBI records in [its] Central Record System ('CRS') are criminal and national security related." Second Hardy Decl., ¶ 16 (emphasis added) (footnotes omitted). But by his own admission, the CRS also contains "personnel" and "administrative" records, see First Hardy Decl., ¶ 21, and the volume of records would seem irrelevant when the agency is querying a search engine. Perhaps the Government can prove otherwise, but it does not appear "unduly burdensome" to ask the agency to search for Donald Trump's name within the CRS and see whether any personnel or administrative records surface.

Of course, personnel and administrative records may be covered by a different FOIA exception — e.g., Exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The FBI has halfheartedly invoked this exemption in issuing its Glomar response, yet it provided no real justification for doing so. See First Hardy Decl., Exh. B. And it is not self-evident that Trump retains a privacy interest in at least certain administrative files. For example, in 2013, he noted he "may" or "may not" bid for the FBI headquarters. See Pl.

MSJ at 20-21 (citing Johnathan O'Connell, <u>Donald and Daughter Ivanka Trump Will Consider</u> <u>Acquiring FBI Headquarters</u>, Wash. Post (Sept. 11, 2013)). Perhaps these were mere musings, but to the extent the FBI maintains administrative files related to such publicly reported interactions, Exemption 6 may not be appropriate. For now, though, it suffices to say that the FBI should construe Plaintiff's request as written — for "any and all" records related to Donald Trump — or submit an affidavit explaining in greater detail why such a search would be unduly burdensome. In the meantime, the Court finds Defendant's "<u>Glomar</u> response [may] be unwarranted" for non-investigative records, and it thus cannot grant summary judgment in its favor. <u>See</u> <u>PETA</u>, 745 F.3d at 545.

2.  *Investigative Records*

Plaintiffs' request for investigative records is a different story. This class, by definition, encompasses materials "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), and is thus covered by Exemption 7. The Court's task, then, is to "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." <u>Davis</u>, 968 F.2d at 1281. While there are exceptions (outlined in detail below), the Court generally finds that the balance tips in Defendant's favor. It therefore concludes that the Government "may still issue a narrowed <u>Glomar</u> response" for most law-enforcement records. <u>See</u> <u>PETA</u>, 745 F.3d at 545

a.  Privacy Interest

Law-enforcement agencies like the FBI and DOJ routinely issue <u>Glomar</u> responses "when responding to requests for documents regarding alleged government informants, trial witnesses, subjects of investigations, or individuals who may merely be mentioned in a law enforcement record." Department of Justice, <u>Guide to the Freedom of Information Act</u> 597-98

(2009 ed.).  Such a response is often appropriate because the very "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation."  Schrecker v. DOJ, 349 F.3d 657, 666 (D.C. Cir. 2003) (quoting Fitzgibbon v. CIA, 911 F.2d 755, 767 (D.C. Cir. 1990)).

Indeed, the D.C. Circuit has "h[e]ld categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197 (D.C. Cir. 1991).  When, as here, a FOIA request "is made for FBI investigative records regarding a particular individual, the FBI's mere acknowledgment that it possesses responsive records associates the individual named in the request with suspected criminal activity."  Citizens for Responsibility and Ethics in Wash. (CREW) v. DOJ, 746 F.3d 1082, 1091 (D.C. Cir. 2014).  In such cases, "the FBI's Glomar response, absent a countervailing public interest in disclosure, [is] appropriate under Exemption 7(C)."  Roth v. DOJ, 642 F.3d 1161, 1179 (D.C. Cir. 2011).

Contrary to Plaintiffs' suggestions, that privacy interest holds regardless of whether the person might be implicated as the target of a law-enforcement investigation or merely a witness.  While "[t]here can be no clearer example of an unwarranted invasion of personal privacy than to release to the public that another individual was the subject of an FBI investigation," Fund for Const'l Gov't v. Nat'l Archives and Records Admin., 656 F.2d 856, 864 (D.C. Cir. 1981) (quoting Baez v. DOJ, 647 F.2d 1328, 1338) (D.C. Cir. 1980)), the D.C. Circuit has held that any "names and identifying information of third parties contained in the investigative files are presumptively exempt." CREW, 746 F.3d at 1096.  This includes "witnesses, informants and investigating agents who may also be mentioned."  Id. at 1092 n.3; see also Roth, 642 F.3d at

1174 ("[W]itnesses, informants, and . . . investigating agents have a substantial interest in ensuring that their relationship to the investigations remains secret.") (internal quotation marks omitted). Nor could the agency differentiate between targets and witnesses without placing a cloud of suspicion over any <u>Glomar</u> response. <u>See</u> <u>PETA</u>, 745 F.3d at 545 (noting if agency "were required to acknowledge responsive documents in instances where there was no investigation but were permitted to give a <u>Glomar</u> response in cases where there had been one, it would become apparent that a <u>Glomar</u> response really meant that an investigation had occurred").

Ordinarily, then, this would be an open-and-shut case. Does the result change because Trump is a public figure — indeed the most public of figures? Plaintiffs say yes. They argue, and the Court agrees, that as President of the United States (and, formerly, as a prominent businessman and celebrity), Trump naturally has a diminished expectation of privacy. <u>See</u> Pl. MSJ at 3. "It is well established, however, that government officials do not surrender all rights to personal privacy when they accept a public appointment." <u>Bast v. DOJ</u>, 665 F.2d 1251, 1254-55 (D.C. Cir. 1981). "While an individual's official position may enter the 7(C) balance, it does not determine, of its own accord, that the privacy interest is outweighed." <u>Id.</u> at 1255 (internal citation omitted).

Take the D.C. Circuit's decision in <u>CREW</u>. There, the Court considered a request for any and all documents related to the FBI's and DOJ's investigation of Tom DeLay, the former Majority Leader of the U.S. House of Representatives, who was allegedly involved in "one of the most significant political corruption scandals in recent memory." <u>CREW</u>, 746 F.3d at 1094. Although DeLay was undoubtedly a "prominent" public official, <u>id.</u>, the Court never questioned that he might retain a substantial privacy interest. <u>Id.</u> at 1092. So, too, here; the Court

concludes that despite his public position (and celebrity status), Trump has at least some privacy interest in whether his name appears in investigative records from 1946 to 2015.

b. Public Interest

On the other side of the ledger, it is Plaintiffs' burden to "show the information [requested] is likely to advance" the public interest. Nat'l Archives and Records Admin. v. Favish, 541 U.S. 157, 172 (2004). Here, the Court concludes that even if Trump's privacy interest is somewhat diminished, the proffered public interest is still insufficient to tip the scales. See Public Citizen Health Research Grp. v. Dep't of Labor, 591 F.2d 808, 809 (D.C. Cir. 1978) ("[A]ny invasion of privacy can prevail, so long as the public interest balanced against it is sufficiently weaker.").

While this may seem counterintuitive given the high-profile fusillades Trump is currently aiming at the FBI, it is critical to remember that "[t]he only relevant public interest" is "the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." CREW, 746 F.3d at 1093 (emphasis added) (internal quotation marks omitted). The inquiry is therefore not focused on any "general public interest in the subject matter of the FOIA request" — i.e., Donald Trump. See Schrecker, 349 F.3d at 661.

Once again, CREW is instructive. As explained, the Court of Appeals there considered a request for law-enforcement records related to Tom Delay, the former Majority Leader. In evaluating Exemption 7(C), the Court of Appeals stressed that "the relevant public interest is not to find out what Delay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct." CREW, 746 F.3d at 1093. That was so even though, at the time of investigation, Delay was serving in the

Government.  Similarly, while citizens may generally be curious about what any President was "up to" before assuming office, the Court cannot consider any public interest in Trump's past activities "for its own sake."  <u>Favish</u>, 541 U.S. at 172.

Plaintiffs acknowledge as much, instead trying to cast their interest as focused on governmental operations.  They posit first that "the FBI's past interactions with Trump will reveal how the FBI performed its substantive law enforcement obligations."  Pl. MSJ at 15.  It is important to remember, however, that Plaintiffs are not requesting information about a particular <u>investigation</u>.  <u>See, e.g.</u>, <u>CREW</u>, 746 F.3d at 1092-95.  Rather, they request records related to a particular <u>individual</u>.   For such requests, "the public interest in understanding the agency's investigatory processes" ordinarily "fails to outweigh the [subject's] substantial interest in nondisclosure."  <u>PETA</u>, 745 F.3d at 543.  The D.C. Circuit has thus "consistently held that Exemption 7(C) authorizes <u>Glomar</u> responses to comparable FOIA requests seeking information about particular individuals."  <u>Id.</u>  In <u>Jefferson</u>, for example, the Court of Appeals considered a request seeking investigatory records concerning a specific Assistant U.S. Attorney.  <u>See</u> 284 F.3d at 175.  It not only sustained the agency's <u>Glomar</u> response but also found the "result virtually compelled by" Circuit precedent.  <u>Id.</u> at 179-80 (citing <u>Kimberlin v. DOJ</u>, 139 F.3d 944, 948 (D.C. Cir. 1998)); <u>see also</u> <u>Beck v. DOJ</u>, 997 F.2d 1489, 1493-94 (D.C. Cir. 1993) (upholding <u>Glomar</u> response as to any complaints or other investigatory files concerning two named DEA agents); <u>Dunkelberger v. DOJ</u>, 906 F.2d 779, 781 (D.C. Cir. 1990) (upholding <u>Glomar</u> response as to a specific FBI agent's disciplinary records).

In each of those cases, the requested files might have shed light on agency investigatory procedures — the same interest Plaintiffs assert here.  Yet the Court of Appeals has "consistently found that interest, without more, insufficient to justify disclosure when balanced against the

substantial privacy interests weighing against revealing the targets of a law enforcement investigation." PETA, 745 F.3d at 543; see also DOJ v. Reports Comm. For Freedom of the Press, 489 U.S. 749, 774-75 (1989) ("[I]t should come as no surprise that in none of our cases construing the FOIA have we found it appropriate to order a Government agency to honor a FOIA request for information about a particular private citizen.").

Plaintiffs next speculate that these records might reveal "whether such a prominent and influential public figure was subjected to the same investigative scrutiny as ordinary citizens." Pl. MSJ at 13. The D.C. Circuit has allowed that the public may have an interest in whether the FBI "pulled its punches" when investigating high-profile targets. See CREW, 746 F.3d at 1093. Critically, however, when "the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure." Favish, 541 U.S. at 174. In such a case, "courts must insist on a meaningful evidentiary showing." Id. at 175; see also Boyd v. Criminal Division, DOJ, 475 F.3d 381, 389 (D.C. Cir. 2007). That is, "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Favish, 541 U.S. at 175. Were this not the case, a requester could go on a fishing expedition for FBI records for any celebrity at all. Id. ("Allegations of government misconduct are easy to allege and hard to disprove.") (internal quotation marks omitted).

In this case, Plaintiffs cited one concrete instance of FBI interest in Trump personally (as opposed to interest in his corporation or employees more generally). They appended a 1981 FBI Report (and a 2016 Washington Post article discussing it) to their FOIA request, which together document the agency's conversations with Trump about his plans to open a casino in Atlantic

City.  See First Hardy Decl., Exh. A.  For reasons discussed below, the Court agrees that a Glomar response might be inappropriate as to records related to that report, but such issue falls outside the scope of the instant Partial Motions for Summary Judgment.  See infra Section III(B)(3)(b).  For now, the Court considers only whether a Glomar response is appropriate as to other hypothetical investigative files about Trump.  On this ground, Plaintiffs give no reason to think that the FBI otherwise investigated him, much less that it "pulled its punches" on any occasion.  Without such a "meaningful evidentiary showing," the Court therefore sees no public interest on that ground.  Favish, 541 U.S. at 175.

Finally, Plaintiffs maintain that "[d]isclosure would also shed light on the contentious relationship between Donald Trump and the FBI."  Pl. MSJ at 13.  This rationale, too, fails to pass muster.  Again, the only pertinent interest is "shed[ding] light on the agency's performance of its statutory duties" or "what their government is up to."  CREW, 746 F.3d at 1093 (emphasis added).  The purpose of FOIA, after all, is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted); it is not to play up palace intrigue.  Plaintiffs offer no evidence, however, that the Department might harbor some sort of grudge against the sitting President, or, critically, that any such feelings motivated an "improper[]" performance of its statutory duties in the past.  See Favish, 541 U.S. at 174.  They therefore cannot proceed on that ground.  Id.  And Trump's personal feelings, of course, cannot shed light on DOJ's activities.  Plaintiffs suggest that because Trump is currently part of the Government, they might have some public interest in what he is "up to."  The request here, however, seeks only documents that predate his time in government and thus necessarily cannot ferret out "secr[et]" actions taken by Trump in his official capacity.  As a result, there is no public interest in disclosure on that basis.

### 3. Alternative Arguments

Although the Court affirms that the FBI may generally issue a <u>Glomar</u> response as to any law-enforcement records, Plaintiffs last argue that such a response would be invalid as to certain classes of investigative files — namely, (a) any documents in which Donald Trump is mentioned "solely in his capacity [as] an official representative of a business entity" or (b) any documents related to an interview Trump gave to <u>The Washington Post</u>.

### a. Business Activities

Plaintiffs ask the Court to siphon off records that mention Trump "solely in his capacity as executive of an organization." Pl. MSJ at 16. The Government, it seems, agrees that Exemption 7(C) does not apply when Trump's name is mentioned in their files solely "in the context of his official capacity as chief executive of specific organizations." Second Hardy Decl., ¶ 9. But what exactly does that mean?

Plaintiffs seem to think that the Court should "draw [a] line between Donald Trump's business activities and his personal activities" and hold Exemption 7(C) protects only the latter category. <u>See</u> Pl. Reply at 15 (citing <u>FCC v. AT&T Inc.</u>, 562 U.S. 397, 403-04 (2011)). This misstates the relevant law. In <u>AT&T</u>, the Supreme Court held that Exemption 7(C)'s privacy protection "does not extend to <u>corporations</u>." 562 U.S. at 410 (emphasis added). It so held because it interpreted the term "personal privacy" in that exemption to "pertain[] to the privacy interests of individuals." <u>Id.</u> at 409 (internal quotation marks omitted). Trump, of course, is an individual. While the Trump Organization has no cognizable privacy interest under FOIA,

Donald Trump retains one, regardless of whether the records pertain to his personal or business affairs.

The line between corporations and individuals, of course, can be blurry. See, e.g., Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2768 (2014) ("A corporation is simply a form of organization used by human beings."). The Court can identify some outer bounds — for instance, imagine that the FBI had investigated Trump (or any other executive) for embezzling funds from corporate coffers. This information, about any crimes taken in his personal capacity, falls squarely within Exemption 7(C), even if it pertains nominally to his "work life." Pl. MSJ at 17. On the other hand, records related to the Trump Organization would receive no protection under FOIA. In addition, Trump would have no privacy interest in his mere affiliation with the Trump Organization, even were the company under scrutiny. After all, Trump's former position is no secret, and "information connected with professional relationships does not" trigger any protected privacy interest. Sims v. CIA, 642 F.2d 562, 574 (D.C. Cir. 1980). As explained below, Exemption 7(C) would not block a request for records related to the Trump Organization, nor would it require the FBI to redact any mention of Trump's affiliation with that company.

It is more difficult to discern how to treat any records relating to Trump's actions in his "official capacity" as chief executive of a corporation — if, for example the FBI investigated him for committing wire fraud on behalf of his organization. For purposes of this Motion, however, the Court need not dwell on the distinction because the Government concedes Exemption 7(C) would not apply to such records. Ordinarily, such concession might defeat the agency's Glomar response. For when "there exists a category of responsive documents for which a Glomar response would be unwarranted, [the agency's] assertion of a blanket Glomar response . . . cannot be sustained." PETA, 745 F.3d at 545. Here, Plaintiffs requested "[a]ny and all records

mentioning or referring to the living person Donald John Trump," and the Bureau agrees that there is one category — records mentioning Trump in his official capacity — that falls outside Exemption 7(C). Plaintiffs therefore argue that the agency must acknowledge any such documents and "be permitted only to issue a partial Glomar response." Pl. Reply at 13.

In his declaration, however, Hardy suggests that the agency has already done exactly that. Remember, the Government's Glomar response covers only "the existence of additional records about Mr. Trump" "[o]utside of [its] limited releases" from an earlier FOIA request. See Second Hardy Decl., ¶ 12 (emphasis added). Previously, Plaintiffs submitted a FOIA request seeking records related to "Trump Entertainment Resorts, Donald J. Trump Foundation, Trump University, and Trump Organization." First Hardy Decl., ¶ 19 n.8 (citing Jason Leopold *et al.* v. DOJ, No. 16-2182). As just explained, each of those organizations has no protected privacy interest under Exemption 7(C). The FBI was therefore required to search for relevant records and ultimately released a number of responsive documents, including ones in which Trump's name appeared unredacted. It stands to reason that any materials mentioning Trump in his "official capacity" as executive of Trump Entertainment Resorts, Donald J. Trump Foundation, Trump University, and Trump Organization would have surfaced in that search.

The Government, however, never says this expressly, thereby leaving a question of fact as to whether it has processed all such records. It thus has two choices: (1) submit an affidavit averring that it has previously released all documents mentioning Trump "in the context of his official capacity as chief executive of specific organizations"; or (2) conduct a search for that subset of records and narrow its Glomar response accordingly. Until then, the Court cannot grant summary judgment upholding the Government's broad Glomar response.

b.  Washington Post article

Finally, and as foreshadowed earlier, Plaintiffs say that Trump has lessened his privacy interest by publicly revealing his interactions with law enforcement during an interview with The Washington Post.  See Pl. Reply at 5; Robert O'Harrow Jr., Trump's Ties to an Informant and FBI Agent Reveal His Mode of Operation, Wash. Post (Sept. 17, 2016).  In that article, Trump apparently discussed his relationship with Daniel Sullivan, a business associate and, as it turns out, FBI informant.  He revealed how Sullivan once arrived at his office with two FBI agents in tow, one of whom Trump considered "a very high quality person."  Id.  The Post article then goes on to quote extensively from a 1981 FBI report by the same agents, describing conversations in which Trump told them about plans for opening a casino, as well as his concerns about Atlantic City.  Id. (noting "TRUMP stated . . . that he was willing to fully cooperate with the FBI" in opening his casino).

The Court agrees that Trump may have opened the door to records related to these interactions.  See CREW, 746 F.3d at 1092 ("Because DeLay's public statements confirmed he had been under investigation, the FBI's acknowledgment that it had responsive records would not itself cause harm by confirming that fact.").  Plaintiffs, however, have jumped the gun in raising such argument now.  In their initial FOIA request, they separately attached the very police report mentioned in the Post article, along with two case numbers referenced in the report. They then requested "[a]ny and all records that constitute, mention, or refer to" either file.  See First Hardy Decl., Exh. A (Addendum C).  The FBI has assigned each request its own case number (1369466-0 and 1359371-0, respectively), and its treatment thereof is not the subject of the Government's instant Motion for Partial Summary Judgment.

True, these records may overlap with the request at issue — *i.e.*, they may include "documents related to Donald John Trump." But "[s]ince these documents are also responsive to other counts of Plaintiffs' request," the FBI has decided to "process and release non-exempt portions of these records to Plaintiffs at a later date and will provide justification for its withholding in a later submission." Second Hardy Decl., ¶ 10. The Court, too, will thus save for another day any dispute over the FBI's treatment of records related to the 1981 report, including those mentioning Trump.

## IV.    Conclusion

All told, the Government comes close to justifying its <u>Glomar</u> response but ultimately claims no cigar. The Court concludes that it has not yet justified its sweeping <u>Glomar</u> response for two categories of responsive records: (1) non-investigative records related to Donald Trump and (2) records that mention Trump "in the context of his official capacity as chief executive of specific organizations." At the same time, it affirms that Defendant may at least issue a narrow <u>Glomar</u> response as to most law-enforcement records. Until then, the Court will deny both parties' Cross-Motions for Partial Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>April 23, 2018</u>